NOT FOR PUBLICATION

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

```
_____  :
                                 :
TOM BUCKLEY,                     :
                                 :  Civil Action No. 09-5460 (RMB)
                 Plaintiff,      :
                                 :
           v.                    :       OPINION
                                 :
MIKE KOWALSKI,                   :
                                 :
                 Defendant.      :
_____  :_____
```

**BUMB**, District Judge:

This matter comes before the Court upon Plaintiff's letter stating that there was a typo in the designation of his P.O. Box, and that typo affected this more than five-year-long litigation. See Docket Entry No. 24.  Granted the length of this proceeding and taking note of Plaintiff's position, this Court finds it warranted to summarize the procedural history of this case.

On October 27, 2009, Plaintiff – then an in forma pauperis litigant and an inmate held at the Atlantic County Justice Facility, Mays Landing, New Jersey ("Facility") – filed a pro se civil complaint raising § 1983 challenges.  See Docket Entry No. 1.  One month later, on January 27, 2010, before his original pleading was screened, Plaintiff filed an amended § 1983 complaint ("Complaint") that superseded his original pleading. See Docket Entry No. 6.

There, he asserted that, on an unspecified date, he was punched by two Facility inmates, Smith and Feldman.[1]    See id. at 4.  Plaintiff also alleged that said incident caused him emotional distress and loss of weight.[2]  See id.  In addition, Plaintiff stated that "[t]he Guard pronted [sic] a dangerous area for [Plaintiff]," but his Complaint neither named any "Guard" as a defendant nor clarified the meaning of his statement.[3]   Id.

Rather, the Complaint informed this Court that Plaintiff was seeking $100,000 in compensatory damages and, in addition, an

_____

[1]   Plaintiff's original pleading suggested that the incident occurred on September 2, 2009.  See Docket Entry no. 1, at 4.

[2]   Furthermore, Plaintiff alleged that the incident caused him "loss [of] profit[]" and "deformation."  Docket Entry No. 6, at 4.  While Plaintiff's statements made in the Complaint suggest that he suffered no physical injury and, hence, he meant to allege "defamation" rather than "deformation," the bases for Plaintiff's loss-of-profit and defamation claims are not immediately apparent from the face of the Complaint.  That said, this ambiguity does not bar this Court's analysis at the instant juncture.

[3]   Although Plaintiff's statement that "[t]he Guard created a dangerous area for [Plaintiff]" read rather cryptic, this Court attempted to distill the gist of Plaintiff's claim by reflecting on the statements he made in his original pleading.  There, he referred to a correctional officer Mike Kowalski ("Kowalski") as a "Guard" and alleged as follows: "Two Guards[.] 1st Guard called me child mol[e]ster [and] 2[nd] called me names [and] refused [to] give me shoes."  Docket Entry No. 1, at 4.  Since the Complaint did not make any references to the unidentified "2nd Guard," this Court concluded that Plaintiff's cryptic statement (that "[t]he Guard created a dangerous area for [Plaintiff]") reflected Plaintiff's belief that Kovalski's alleged "child molester" reference prompted Smith and Feldman to punch Plaintiff.  Accord Docket Entry No. 6, at 4 (assertng that Smith "hit [Plaintiff] because Guard Kowalski said [the phrase ']child mol[e]ster[']").

2

unspecified amount in "trouble" damages, which this Court presumed to be punitive damages.  See id.

On April 16, 2010, this Court entered an order and accompanying opinion granting Plaintiff in forma pauperis status and screening Plaintiff's claims against Smith and Feldman.  See Docket Entries Nos. 7 and 8.  The Court explained to Plaintiff that his claims against Smith and Feldman were not cognizable under Section 1983 since these inmates did not qualify as state actors.  See Docket Entry No. 7, at 5.  Therefore, the Court dismissed Plaintiff's Complaint for failure to meet the color of law requirement.  See id. at 5-6; see also Docket Entry No. 8. However, the dismissal was without prejudice, and Plaintiff was allowed an opportunity to elaborate on his claim, if any, against Kowalski, provided that his re-amended pleading was filed within forty-five days.[4]  See id.  This Court's determination to that effect was entered on April 16, 2010 ("April Decision").  See id.

The forty-five-day period allowed by the April Decision expired, but no re-amended pleading was filed.  See, generally, Docket.  However, more than six months after the entry of the April Decision, Plaintiff did make a filing: he filed another §

---

[4] Since it was not immediately clear whether Plaintiff was a pre-trial detainee or a convicted prisoner at the time of the alleged incident, this Court – out of an abundance of caution – assessed Plaintiff's potential claim against Kowalski under the Due Process clause of the Fourteenth Amendment rather than under the Eighth Amendment ban on cruel and unusual punishment.

1983 civil complaint which the Clerk understandably construed as a new and separate pleading and commenced Buckley v. Feldman ("Buckley-II"), Civil Action No. 10-6181.  See Buckley-II, Docket Entry No. 1.  The Buckley-II complaint, however, was effectively a repeat of Plaintiff's Complaint dismissed without prejudice by this Court's April Decision.  Compare id. to Instant Matter, Docket Entries Nos. 1 and 6.  Therefore, upon conducting its periodic review of the docket, this Court: (a) located Buckley-II; (b) detected the substantive similarity between the Buckley-II claims and the challenges Plaintiff raised here; and, therefore, (c) construed the Buckley-II pleading as Plaintiff's second amended complaint submitted in the instant matter.  See Instant Matter, Docket Entry No. 10.  With that, this Court directed the Clerk to administratively terminate Buckley-II as duplicative of the case at bar.  See id.

Taking notice of the fact that the Buckley-II pleading named, as defendants, Feldman, the Facility and Kowalski, this Court: (a) re-dismissed Plaintiff's challenges against Feldman for failure to meet the color of law requirement; and (b) dismissed Plaintiff's allegations against the Facility on the grounds that the Facility was not a "person" within the meaning of Section 1983.  See Docket Entry No. 12.  As to Kowalski, this Court found that he was properly named as a defendant (in the sense that he was a state actor and a person amenable to a § 1983

4

suit for damages) but reserved screening Plaintiff's claim against Kowalski.  See Docket Entry No. 12.  However, being mindful of the two and a half years that had expired since the alleged incident (that is, the incident when Plaintiff was supposedly punched by Smith and Feldman), this Court directed the Clerk to execute service on Kowalski so to apprise Kowalski of this litigation.  See id.[5]

To add to the complexities of this matter, the above-detailed dense procedural background took place against a troubling backdrop of Plaintiff's systemic failure to comply with the District's Local Rule requiring unrepresented parties to promptly notify the Clerk of their changes in address.  This Court summarized the pattern of Plaintiff's litigation as follows:

> This civil matter . . . has been thickly peppered by returns of this Court's decisions (and the Clerk's other mailings addressed to Plaintiff) on the grounds of Plaintiff's numerous changes in address and his constant failures to apprise the Clerk of each new address.  Correspondingly, this matter has been numerously terminated on the grounds of Plaintiff's failure to comply with the Local Rule directing "unrepresented parties to advise the Court of any change in their address within seven days of being

---

[5]  The Clerk duly complied by issuing a summons in Kowalski's name, and the U.S. Marshal attempted service.  See Docket Entry No. 13.  However, that summons was returned unexecuted, and Plaintiff provided the Clerk and U.S. Marshal with no assistance in locating Kowalski.  See Docket Entry No. 17.  Correspondingly, the summons issued by the Clerk expired, and this matter reverted back to its screening point.  See id.

> apprised of such change by filing a notice of said
> change." Yet, upon each Plaintiff's filing informing
> the Clerk of Plaintiff's new address, this Court,
> mindful of Plaintiff's pro se litigant status, was
> directing the Clerk to reopen this matter so to address
> the next step in this proceeding. The last such
> measure was taken on June 2, 2014, when - after
> abandoning this litigation for two years - Plaintiff
> filed his May 20, 2014, letter stating that his address
> changed to [a] P.O. Box [in] Hoboken . . . . However,
> the Clerk's mailing (informing Plaintiff that this
> matter was reopened pursuant to this Court's June 2,
> 2014, order) was returned as undeliverable, even though
> it was sent to the Hoboken address he provided. Thus,
> this matter has again become subject to termination
> under Rule 10.1(a).

Docket Entry No. 23, at 1-2 (emphasis, ellipses and citations omitted).

In response to the above-quoted observation, Plaintiff filed the letter at bar: (a) stating that there was a typographical error in the designation of the P.O. Box used by Plaintiff; and (b) assuring this Court that Plaintiff has always been in due receipt of all Clerk's mailings. See Docket Entry No. 24.

The nature of Plaintiff's reference to the alleged typographical error is not entirely clear to this Court since the Clerk's mailings returned to the Clerk were, indeed, addressed to Plaintiff's allegedly *correct* Hoboken address, i.e., to the address *without* the alleged typographical error. That said, being satisfied with Plaintiff's assurances that he is in due receipt of all Clerk's mailings, this Court find the errornot warranting review and, with that, proceeds to screening

6

Plaintiff's allegations against Kowalski to prompt a resolution of this protracted matter.

Two concepts guide this Court's analysis of Plaintiff's allegations against Kowalski: one is the pleading standard of Rule 8 and another is the substantive test applicable to failure-to-protect claims. Under the pleading standard, if the plaintiff establishes a *only a possibility* that he suffered a wrong, such "possibility" cannot qualify as a viable claim. "[A] complaint must contain sufficient factual matter, [which,] accepted as true, [does] 'state a claim to relief that is *plausible* on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007), emphasis supplied). "The plausibility standard . . . asks for *more than a sheer possibility* that a defendant has acted unlawfully." <u>Id.</u> at 662 (emphasis supplied). This pleading standard was specifically adopted to eliminate those claims that did not present "enough" factual matter and asserted a mere "possibility." <u>See</u> <u>Twombly</u>, 550 U.S. at 556. Simply put, where the plaintiff fails to nudge his/her "claims across the line from conceivable [i.e., from merely possible,] to plausible, [his/her] complaint must be dismissed." <u>Id.</u> at 570.

The Court of Appeals' <u>Bistrian v. Levi</u> decision aptly demonstrated the importance of this possibility-plausibility

distinction for the purposes of a failure-to-protect claim.  <u>See</u>
696 F.3d 352, 367 (3d Cir. 2012).

The <u>Bistrian</u> Court built on the long-established substantive
test governing failure-to-protect claims.  The Eighth Amendment's
prohibition against the infliction of cruel and unusual
punishment has been interpreted to impose upon prison officials a
duty to take reasonable measures "to protect prisoners from
violence at the hands of other prisoners." <u>Hamilton v. Leavy</u>, 117
F.3d 742, 746 (3d Cir. 1997) (quoting <u>Farmer v. Brennan</u>, 511 U.S.
825, 833 (1994)) (internal citations omitted).[6]  However, not
"every injury suffered by one prisoner at the hands of another .
. . translates into constitutional liability for prison officials
responsible for the victim's safety."  <u>Farmer</u>, 511 U.S. at 834.
Indeed, the plaintiff must establish more than a mere fact of
having an incident with another inmate.  <u>See</u> <u>Shelton v. Bledsoe</u>,
2012 U.S. Dist. LEXIS 153059 (M.D. Pa. Oct. 24, 2012).  This is
so because negligent conduct by prison officers, even if it leads
to a serious injury of a prisoner in the hands of another

_____

[6]  Since the <u>Bistrian</u> Court clarified that the Eighth
Amendment test set forth in <u>Farmer</u> applied to pre-trial detainees
whose challenges were governed by the Due Process Clause of the
Fourteenth Amendment, <u>see</u> <u>Bistrian</u>, 696 F.3d at 366-67 (under the
Constitution's guarantees of due process, a pre-trial detainee is
entitled to no less protection from inmate violence than a
sentenced inmate is under the Eighth Amendment), the substantive
test set forth in <u>Farmer</u> and its progeny governs Plaintiff's
claim against Kowakski.

prisoner, does not expose the officers to liability under § 1983. See Davidson v. Cannon, 474 U.S. 344, 347-48 (1986); see also Cty of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).  Therefore, to state a viable failure-to-protect claim, the plaintiff must detail the facts showing that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the [defendant-officer] was deliberately indifferent to that substantial risk . . . , and (3) the [defendant's] deliberate indifference caused [the plaintiff's] harm."  Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012); see also Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).

Because deliberate indifference is a subjective standard, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  Whetzel, 256 F.3d at 125.  Paramount here, a prison official's awareness of overall violence among the inmate or of violent propensities (or history of violence) of particular inmates does not supply an inference of deliberate indifference.  See, e.g., Bistrian, 696 F.3d at 371 (the "risk that an inmate with a history of violence might attack another inmate" is too "speculative" to give rise to an inference of deliberate indifference); cf. Schwartz v. Cty of Montgomery, 843 F. Supp. 962, 971 (E.D. Pa. 1994), aff'd, 37 F.3d 1488 (3d Cir. 1994).

9

To illustrate this crucial distinction between: (a) a "plausibility" scenario (ensuing from an officer's actual awareness of the excessive risk to the inmate's safety); and (b) a "mere possibility" scenario, the Court of Appeals in <u>Bistrian</u> reflected on two different injuries suffered by the very same plaintiff.

There, the inmate Peter Bistrian, being housed in a special housing unit ("SHU"), was recruited by prison officials to assist the prison's Special Investigative Services ("SIS") and FBI agents.  Since Bistrian, being an orderly in the SHU, was asked by other SHU inmates (who were known gang members investigated by the FBI) to pass their notes from one another, the SIS/FBI officers directed Bistrian to bring those notes first to the SIS office (for photocopying and investigation) and then deliver the notes to the intended addressees.

Unfortunately, the untidy SIS operations resulted in numerous occasions when the photocopied notes (rather than the original notes) were returned to Bistrian for delivery to the addressees, which put the gang members on notice about Bistrian being an informant.  When the gang-member inmates began expressly threatening Bistrian that they would harm him as soon as they see him in the recreation yard, Bistrian advised the prison officials of those threats.  Yet, the very next month, Bistrian was placed in a locked recreation yard pen with those gang members, and they

10

beat him unconscious and continued beating him after he passed
out, causing Bistrian a dislocated left shoulder, broken teeth,
and multiple contusions and lacerations to his head and face
("First Scenario").

Four months later, Bistrian was put in the recreation yard
with another inmate (who was not related to the gang-members that
injured Bistrian, but that inmate had a history of violence
because he was frequently – but randomly – attacking other
detainees, and the prison officers were aware of those attacks).
That inmate attacked Bistrian with a razor by slashing and
cutting Bistrian's face, arms and legs ("Second Scenario").

Bistrian sued, seeking damaged on the basis of these two
scenarios and claiming failure to protect in both instances.

Examining these two scenarios, the Court of Appeals
concluded that the First Scenario alleged a sufficiently
plausible failure-to-protect claim, while the Second Scenario
asserted an insufficient claim, since it was based on a mere
possibility of harm.  The <u>Bistrian</u> Court explained as follows:

> [W]e conclude that keeping Bistrian in the SHU was
> itself not unreasonable, but . . . we conclude that
> Bistrian state[d] a plausible failure-to-protect claim
> [in the First Scenario].  . . . [P]utting him in a
> locked recreation area with [the gang members] posed a
> substantial risk of serious harm because (a) [the gang
> members] knew of Bistrian's cooperation with prison
> officials plus (b) [the gang members] had a violent
> criminal past and had previously threatened to attack
> Bistrian in the recreation yard because of that
> cooperation. . . . [Prison] officials were deliberately

indifferent to the obvious risk posed because they made
no attempt to prevent his placement in the yard with
[the gang members] despite the fact that . . . Bistrian
. . . repeatedly advised the officials responsible for
the photocopying operation of the threats [that the
gang members] made.  [Finally,] Bistrian [sufficiently]
ple[d] causation: [the gang members] violently attacked
him . . . in the recreation yard because he cooperated
with prison officials [in exposing their gang-
relations].  . . .  We acknowledge that when inmates
claim they are in danger, they confront prison
officials with an arduous task.  Prisoners may feign
their fear of physical harm simply to manipulate a
transfer, in the hope, for example, of obtaining more
desirable living arrangements.  But [in the First
Scenario], Bistrian sets out sufficient factual
allegations . . . radically different from an
out-of-the-blue and unadorned "I'm-in-trouble"
entreaty.  . . .  Given [the SIS/FBI's] familiarity
with the [photocopying] scheme and the players
involved, [Bistrian's facts show that it was] plausible
that they knew Bistrian's cries for help were
legitimate and that he faced a substantial risk of
serious harm.  After all, the genesis of the
[photocopying] operation was a desire to assist an FBI
investigation into violent criminal activity by [the
gang members] that included, among other things,
substantial witness intimidation. . . .

[In contrast,] Bistrian does not allege that [the
inmate who attacked him in the Second Scenario] had any
connection to [the gang members] or that [this inmate]
otherwise attacked [Bistrian] because he was an
informant.  . . .  Bistrian [merely] refers to [this
inmate's] "history of violent assaults against other
inmates" . . .  We cannot conclude on these allegations
that prison officials were deliberately indifferent to
such a speculative risk.

Bistrian, 696 F.3d at 368-71 (citations and internal quotation

marks omitted).[7]

---

    [7]  Accord Shelton v. Bledsoe, ___ F.3d ___, 2015 U.S. App.
LEXIS 253 (3d Cir. Pa. Jan. 7, 2015) (addressing another version
of a plausible scenario and reversing grant of summary judgment

Here, Plaintiff's allegations against Kowalski fail to reach even the level of the Second Scenario addressed in Bistrian; a fortiori, these allegations cannot reach the benchmark set by the First Bistrian Scenario (or by the scenario addressed in Shelton).  Here, Plaintiff: (a) merely asserts that Kowalski referred to him as a "child molester"; and then (b) self-servingly speculates that Smith and Feldman must have construed that reference as a statement reflecting on the charges Plaintiff actually faced (rather than as a derogatory term) and must have punched plaintiff simply because of their uncontrollable animus to child molesters.

However, Plaintiff offers this Court no facts showing that Smith and/or Feldman had an actual uncontrollable animus to child molesters.  Analogously, Plaintiff offers this Court no facts

---

in favor of Special Management Unit ("SMU") officers.  There, an inmate housed at the SMU stated facts showing that: (a) the SMU "house[d] inmates who have been identified as having violent tendencies or who have a history of gang involvement; (b) the "SMU officials . . . responsible for assigning cellmates in a manner that ensures the safety and security of the prison [invariably] interviewed [all incoming inmates since the SMU officials were obligated] to ensure that inmates who may be hostile to each other [were] not housed in the same cell"; but (c) the SMU officials intentionally "engaged in a pattern, practice, or policy of improperly placing inmates who [were] known to be hostile to each other in the same cell [and then intentionally] fail[ed] to intervene when the predictable inmate-on-inmate violence erupt[ed]"; and (d) to maximize the amount of such inmate-on-inmate violence, the SMU officials punished and intimidated those "inmates who refuse[d] cell assignments with [those] inmates who [were] known to be hostile to them").

showing: (a) that Kowalski had a reason to know that Smith and/or Feldman had such an animus and that they would construe Kowalski's references as a statement about the charges Plaintiff faced (rather than a mere derogatory term); or (b) that Kowalski was deliberately indifferent to the substantial risk of such misconstruction and substantial risk of harm that his reference would cause.[8]  In sum, all Plaintiff offers this Court is his bold self-serving deducements.

This is exactly the mode of pleading against which the Supreme Court warned by stressing that a complaint must be dismissed if the plaintiff fails to nudge his "claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570; because "[t]he plausibility standard . . . asks for *more than a sheer possibility* that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.  Correspondingly, at this juncture, Plaintiff's allegations against Kowalski are insufficient and will be dismissed.

That said, mindful of Plaintiff's pro se litigant status, this Court finds it warranted to allow Plaintiff one final opportunity to re-plead his claim against Kowalski by detailing

---

[8]  Indeed, even if this Court were to presume that Kowalski actually made the alleged "child molester" reference, the allegations provided thus far suggest that Kowalski used the "child molester" reference as a derogatory term and was, at most, negligent about the consequences of his utterance.

his *facts*, if any, making the requisite showing under the test set forth in <u>Farmer</u> and elaborated upon in <u>Bistrian</u>.[9]

For the foregoing reasons, this matter will remain in administrative termination subject to reopening in the event Plaintiff timely submits his third amended complaint.  <u>See</u> <u>Papotto v. Hartford Life & Accident Ins. Co.</u>, 731 F.3d 265 (3d Cir. 2013) ("administrative closings [are not final dismissals on the merits; rather, they] are a practical tool used by courts to prune overgrown dockets").[10]

---

[9]   Since Plaintiff has been long released from confinement, Plaintiff's continuous suitability for <u>in forma pauperis</u> status is uncertain at this juncture. Analogously, the fact that – more than five years after the alleged incident – Kowalski has not been served with Plaintiff's pleading (and, thus, Kowalski is still wholly unaware of Plaintiff's claim, and might be greatly disadvantaged by this lengthy passage of time) is a substantial concern to this Court.  Finally, the fact that the U.S. Marshal was unable to locate Kowalski and execute service (and Plaintiff failed to provide the Clerk and the U.S. Marshal with assistance as to locating Kowalski for the purposes of service of process) is an additional consideration since it suggests that this Court might never obtain <u>in personam</u> jurisdiction over Kowalski.  Yet, these procedural and jurisdictional considerations need not be reached at this juncture since the substantive deficiency of Plaintiff's allegations, unless cured, would render these obstacles moot.  Therefore, this Court's determinations as to these procedural and jurisdictional aspects will be reserved.

[10]   The Court strongly cautions Plaintiff against disguising bold self-serving deducements as facts.  As the Supreme Court explained:

> Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . [A viable] complaint must contain sufficient factual matter . . . to "state a claim to relief that is plausible on its face."

An appropriate Order follows.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: January 14, 2015

---

Iqbal, 556 U.S. at 678-79.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)); accord Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").  Hence, Plaintiff's allegations must be factual, i.e., a description of "the who, what, when, where, and how: the first paragraph of any newspaper story."  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999).